# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 19, 2012          Decided February 10, 2012

No. 11-3068

UNITED STATES OF AMERICA,
APPELLANT

v.

ALLEN L. MURDOCK,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cr-00135-1)

*Mary B. McCord*, Assistant U.S. Attorney, argued the cause for appellant. With her on the briefs were *Ronald C. Machen*, *Jr.*, U.S. Attorney, and *Roy W. McLeese III*, Assistant U.S. Attorney.

*David W. Bos*, Assistant Federal Public Defender, argued the cause for appellee. With him on the brief was *A.J. Kramer*, Federal Public Defender.

Before: TATEL and GRIFFITH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: The question in this criminal case is whether appellee's statements, which the government concedes the police obtained in violation of his rights under *Miranda v. Arizona*, are nonetheless admissible for purposes of impeachment should he testify at trial. The district court held they were not. For the reasons set forth in this opinion, we reverse.

**I.**

On May 1, 2009, at approximately 1:00 a.m., police officers were called to a house at 4800 Dix Street NE, Washington, D.C. There they found a body, blood-soaked, riddled with bullets, and later identified as Prince Wright. The ensuing investigation, conducted by Detective Daniel Whalen of the Metropolitan Police Department, led to defendant and appellee, Allen L. Murdock, then incarcerated in the Baltimore City Jail.

At Detective Whalen's request, Murdock was transferred from the jail to the Baltimore City Police Department for interrogation. The interview took place in an approximately seven-by-seven-foot windowless room. Detective Whalen, accompanied by a detective from the Baltimore City Police Department, conducted the interview. Neither officer was armed.

At the start of the interview, Detective Whalen introduced himself, explained to Murdock that he was in custody, and informed him that their conversation was being recorded. Detective Whalen did not beat around the bush: he told Murdock that he was there as part of an investigation into the murder of Prince Wright, that the police had an outstanding warrant for his arrest, and that he would be

extradited to the District of Columbia. Detective Whalen explained that he was not interested in having "a discussion about whether [Murdock was] there . . . [when the] murder occurred." Interrogation Rec. 3:37–3:50. But if Murdock played no role in the murder, "this [was his] opportunity to straighten it out." *Id.* at 4:53. Detective Whalen explained to Murdock that he had no obligation to speak, but asked him whether he wished to talk anyway. Murdock declined, saying that he was unaware of what had happened. When Detective Whalen demanded a yes or no answer, Murdock responded, "No." *id.* at 8:04–8:21. When Detective Whalen again asked Murdock, "You don't want to talk to me?" Murdock again said "no." *id.* at 8:25. Detective Whalen then explained to Murdock that he would "read [him his] rights . . . [and] ask [him] just one or two basic questions." *Id.* at 8:24–8:36. After reading him his rights, the Detective immediately began questioning Murdock, who then readily answered questions for forty-five minutes.

On May 20, 2011, Murdock was indicted in the United States District Court for the District of Columbia on one count of first-degree premeditated murder while armed, D.C. Code §§ 22–2101, –4502, one count of possession of a firearm during a crime of violence, *id.* § 22–4504(b), and one count of conspiracy to distribute and possess with the intent to distribute 500 grams or more of cocaine, 21 U.S.C. §§ 841(b)(1)(B)(ii), 846. Murdock filed a motion to suppress statements he made during the interview. In response, the government conceded that the questioning violated Murdock's *Miranda* rights and represented that it would therefore not use the Defendant's statement in its case in chief. Nonetheless, the government argued, Murdock's statements were admissible for purposes of impeachment should he choose to testify. The district court disagreed, holding that "[b]ased on the totality of the facts, . . .

[Murdock's] statements were not voluntary and were made in violation of his *Miranda* rights. The Defendant clearly said—twice—'no' to Detective Whalen's question as to whether he wanted to talk about the murder." *United States v. Murdock*, No. 10-135, slip op. at 3 (D.D.C. May 26, 2011). According to the district court,

> Not only was the Defendant in custody, about which there is no question, but he was certainly aware that he was in a very problematic situation, and would most likely face a first degree murder charge. When he said "no" the first time, all questioning should have stopped. When he said "no" the second time, all questioning should have stopped. The Defendant made clear that he did not wish to answer any questions. . . . Given the fact that Defendant was in custody on an unrelated charge, that he had been told in no uncertain terms that he would be extradited, arrested, and probably charged with murder, and that his two refusals to talk were ignored by Detective Whalen, the statements he gave were certainly not voluntary.

*Id.* The government filed a motion to reconsider, which the district court denied.

The government now appeals, arguing that the district court erred in concluding that Murdock's statements to Detective Whalen were involuntary. We have jurisdiction pursuant to 18 U.S.C. § 3731 (providing for appellate review of "decision[s] or order[s] of a district court suppressing or excluding evidence . . . in a criminal proceeding").

**II.**

The government "do[es] not contest the district court's conclusion that Detective Whalen questioned [Murdock] in violation of *Miranda* by failing to scrupulously honor [Murdock's] right to cut off questioning." Appellant's Br. 16 (alterations and internal quotation marks omitted). But as the government points out, statements made by a defendant in circumstances violating the strictures of *Miranda* "are admissible for impeachment if their trustworthiness . . . satisfies legal standards." *Mincey v. Arizona*, 437 U.S. 385, 397–98 (1978) (internal quotation marks omitted). For example, in *Harris v. New York*, 401 U.S. 222 (1971), the Supreme Court held that statements obtained in violation of *Miranda*, though inadmissible as part of the government's case in chief, were admissible for purposes of impeachment should the defendant choose to testify. Reiterating this holding in a later case, the Court explained that "the impeaching material would provide valuable aid to the jury in assessing the defendant's credibility"; that "the benefits of this process should not be lost"; and that officers are "sufficient[ly] deterre[d]" from violating a suspect's *Miranda* rights "when the evidence in question is made unavailable to the prosecution in its case in chief." *Oregon v. Hass*, 420 U.S. 714, 722 (1975) (internal quotation marks omitted). To deal with any potential abuse, the Court instructed that "[i]f, in a given case, the officer's conduct amounts to an abuse, that case, like those involving coercion or duress, may be taken care of when it arises measured by the traditional standards for evaluating voluntariness and trustworthiness." *Id.* at 723.

In order to introduce statements at trial—whether in its case in chief or as impeachment evidence—the government bears the burden of proving that the statements were voluntary. *See Lego v. Twomey*, 404 U.S. 477, 489 (1972). Voluntariness turns on whether the "defendant's will was

overborne" when he gave his statement, *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973), and the test for this is whether the statement was a "product of an essentially free and unconstrained choice by its maker." *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961). The "ultimate issue of 'voluntariness' is a legal question," *Miller v. Fenton*, 474 U.S. 104, 110 (1985), that "requires [a] careful evaluation of all the circumstances of the interrogation," *Mincey*, 437 U.S. at 401, including but not limited to the defendant's age and education, the length of detention, whether the defendant was advised of his rights, and the nature of the questioning, *Schneckloth*, 412 U.S. at 226; *see also Withrow v. Williams*, 507 U.S. 680, 693 (1993). We "review[] the district court's factual findings for clear error . . . [and] give due weight to inferences drawn from those facts by the district court." *United States v. Bailey*, 622 F.3d 1, 5 (D.C. Cir. 2010).

As noted above, the district court emphasized three circumstances of Murdock's interrogation: that Murdock was in custody, that Detective Whalen told Murdock that "he would be extradited, arrested, and probably charged with murder," and that Murdock twice said "no" when asked by the detective whether he would like to talk. As the government observes, however, the first two factors are inherent in any custodial interrogation, i.e., the suspect will be in custody and will understand that the government is conducting an investigation in order to determine whether to bring criminal charges. *See Hass*, 420 U.S. at 722–23 ("[The defendant] properly sensed, to be sure, that he was in 'trouble'; but the pressure on him was no greater than that on any person in like custody or under inquiry by any investigating officer."). And although the third factor establishes a *Miranda* violation, the Supreme Court has held, in no uncertain terms, that a *Miranda* violation alone is insufficient grounds for suppressing statements offered to

impeach the defendant's testimony. *See generally Harris*, 401 U.S. 222; *Hass*, 420 U.S. 714. The detective's failure to honor Murdock's *Miranda* right is certainly relevant to whether Murdock's statements were voluntary, but it is insufficient by itself to establish involuntariness. *See, e.g.*, *Parsad v. Greiner*, 337 F.3d 175, 184 (2d Cir. 2003) ("The mere fact that police officers improperly question a suspect after he invokes his right to remain silent during a custodial interrogation does not render his subsequent statements the product of coercion.").

Murdock argues that the totality of circumstances demonstrates that his statements were involuntary. He relies primarily on the Ninth Circuit's decision in *Collazo v. Estelle*, 940 F.2d 411 (9th Cir. 1991). There, the defendant was taken to an interview room and advised of his *Miranda* rights. The officers refused the defendant's request to talk with his wife. He then asked to speak to an attorney, to which an officer responded: "[i]t's up to you"; "[t]his is your last chance to talk to us though"; "[o]nce you get a lawyer, he's gonna say forget it"; "don't talk to the police"; and "might be worse for you." *Id.* at 414. The officer then left the room. Three hours later, prior to being provided counsel, the defendant confessed. *Id.* The Ninth Circuit held that these statements were involuntary and thus inadmissible. According to Murdock, his statements were equally involuntary: Detective Whalen threatened him with charges, suggested that it behooved him to talk, and refused to accept his claim that he knew nothing about what happened the night of the murder. In particular, Murdock argues, "Detective Whalen tricked him into believing that a statement might lead to no charges being filed." Appellee's Br. 24. In support of this argument, Murdock relies on the following statements made by Detective Whalen: (1) "I've gotten the warrant for you . . . [and] I've got the ball rolling . . . [and] this is your opportunity to stop that ball from rolling . . . . I can stop the

process," Interrogation Rec. 6:40; and (2) "[i]f on the other hand, you wanna just roll the dice and just say, you know, prove it, or I'm not gonna say anything to incriminate myself . . . I'll take your silence, or your denials, and . . . I'll make my own conclusions about what that means, and we'll just move forward," *id.* at 8:00. These techniques, Murdock contends, are incompatible "with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means." *Miller*, 474 U.S. at 116.

As the government points out, however, the key fact in *Collazo* was the officer's "menacing" admonition that requesting a lawyer might leave the defendant "worse" off. 940 F.2d at 416. Detective Whalen never suggested that things would be worse for Murdock if he exercised his right to remain silent or that it would be against Murdock's interest to speak with a lawyer. In addition, the detective's statements "did not amount to a promise that no charges would be brought if [Murdock] spoke to him, or to a promise of leniency. At most, the detective was saying that he would investigate any explanation [Murdock] might offer about what happened inside the house when Prince Wright was murdered." Appellant's Reply Br. 5–6. More fundamentally, the detective's statements—little more than "we'll look into your explanation and we won't charge you if you're right"— hardly amount to a situation where Murdock's "will was overborne," *Schneckloth*, 412 U.S. at 226. Thus, as the government argues, the only similarity between this case and *Collazo* is that the interrogating officer violated the suspect's *Miranda* rights.

The government emphasizes other factors indicating that Murdock's statements were voluntary: (1) Murdock "was a 33-year-old adult who had been incarcerated previously," Appellant's Br. 25; (2) he had been given water and did not

complain of physical discomfort, *id.* at 26; (3) he agreed during the interview that " 'everything [was] alright,' " *id.* (quoting Interrogation Rec. at 1:10:02); (4) he showed "no apparent mental impairment, understood the detective's questions, and gave intelligent answers," *id.*; (5) the interview took place in a standard interrogation room and "lasted only a little over an hour," *id.* at 27; (6) Detective Whalen "made no false statements about the evidence," *id.*; and (7) Murdock was offered no promises, *id.* at 28. The government claims that the district court ignored these factors. The district court, however, explained that its decision was "[b]ased on the totality of the facts," *Murdock*, No. 10-135, slip op. at 3, and we take it at its word. *See, e.g.*, *Addamax Corp. v. Open Software Found., Inc.*, 152 F.3d 48, 55 (lst Cir. 1998) ("[T]he district court was not required to make findings on every detail, was not required to discuss all of the evidence that supports each of the findings made, and was not required to respond individually to each evidentiary or factual contention made by the losing side."). That said, although it is possible that the police could subtly overcome the will of a thirty-three-year-old man even if he was provided water, had no apparent mental impairment, and generally answered questions intelligently, nothing in this case (other than the conceded *Miranda* violation) undermines the record evidence of voluntariness. Without more, we must find that the government has met its burden.

## III.

The judgment of the district court is reversed.

*So ordered.*